# 23-1108

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

RUPINDER SINGH, JEFFREY S. POPKIN, JONI WALKER, AND JENNY
MARK, individually and on behalf of all others similarly situated,
*Plaintiffs- Appellants.*

v.

DELOITTE, LLP, THE BOARD OF DIRECTORS OF DELOITTE, LLP, THE
RETIREMENT COMMITTEE OF DELOITTE, LLP, and JOHN DOES 1-30,
*Defendants-Appellees*

**Appeal from the United States District Court for the
Southern District of New York**

**BRIEF FOR PLAINTIFFS-APPELLANTS**

Mark K. Gyandoh
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax: (717) 233-4103

*Attorneys for Plaintiffs-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Second Circuit Local Appellate Rule 26.1, Appellants, Rupinder Singh, Jeffrey S. Popkin, Joni Walker, and Jenny Mark, make the following disclosure:

(1)    For nongovernmental corporate parties, please list all parent corporations:

*Not applicable.*

(2)    For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*Not applicable.*

(3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*Not applicable.*

4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the

case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

*Not applicable.*

Dated:  November 3, 2023                          */s/ Mark K. Gyandoh*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

JURISDICTIONAL STATEMENT ........................................................1

A.  District Court's Subject Matter Jurisdiction................................1

B.  Court of Appeals' Jurisdiction...........................................1

C.  Timeliness of Appeal....................................................1

D.  Final Judgment.........................................................1

STATEMENT OF THE ISSUE...................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................2

STATEMENT OF THE CASE...................................................2

I.  Procedural History....................................................3

II.  Statement of Facts ...................................................3

    A.  Overview of the the Plan .....................................3

    B.  Costs for Recordkeeping Services Vary Little for Plans with a
       Substantial Number of Participants......................................4

    C.  Much Information Relating to Direct Evidence of Fiduciary
       Misconduct Remains in Defendants' Sole Possession......................7

    D.  Circumstantial Factrs and Evidence Plausibly Show the Plan Paid
       Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a
       Prudent Process to Evaluate Fees......................................9

      1.    There is No Indication Defendants Conducted RFPs at Reasonable Intervals ...................................................................9

      2.    Market Surveys, Form 5500s, and other Sources Noted Below are Reliable Sources for Participants to Determine Whether the Plan's Recordkeeping Fees are Unreasonable ..........................10

              *The Fidelity Stipulation* .............................................................14

              *Market Surveys Demonstrate the Unreasonableness of the Plan's RKA Fees* ........................................................................15

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ...................................................................19

ARGUMENT ........................................................................................22

I.    Defendants Breached Their Fiduciary Duties In Failing To Monitor the Plan's Recordkeeping Fees..............................................................22

    A.    The District Court Erred In Denying Plaintiffs' Mtoin to File an Amended Complaint By Applying An Improper Standard Of Review Under a Rule 12(b)(6) Motion to Dismiss to the Proposed First Amended Complaint...........................................................................22

    B.    The District Erred In Failing To Consider the Considerable Circunmstantial Evidence That The Plaintiffs Pled Showing that The Defendants Breached Their Fiduciary Duties ......................................25

II.   The First Amended Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor............................................................................39

CONCLUSION ......................................................................................40

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Albert v. Oshkosh Corp.,*
47 F.4th 570 (7th Cir. 2022) ................................................................... 32, 35, 36

*Allison v. L Brands, Inc.,*
2021 WL 4224729 (S.D. Ohio Sept. 16, 2021) ...................................................37

*Ashcroft v. Iqbal,*
556 U.S. 662 (129 S.Ct. 2009)...........................................................................25

*Braden v. Walmart Stores, Inc.,*
588 F.3d 585 (8th Cir. 2009) .....................................................................*Passim*

*Carrigan v. Xerox Corp.*
No. 3:21-CV-1085 (SVN), 2022 WL 1137230 (D. Conn. Apr. 18, 2022)....... 28, 33

*Cassell v. Vanderbilt,*
285 F.Supp.3d 1056 (M.D. Tenn. 2018)..............................................................37

*Cunningham v. Cornell Univ.,*
No. 16-CV-6525, 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ..........................30

*Davis v. Magna Int'l of America, Inc.,*
2021 WL 1212579 (E.D. Mich. March 31, 2021) .................................................37

*Davis, et al. v. Washington U.,*
960 F.3d 478 (8th Cir. 2020) ..............................................................................*21*

*Disselkamp, et al. v. Norton Healthcare, Inc. et al.,*
2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) .......................................................37

*Donovan v. Bierwirth,*
680 F.2d 263 (2d Cir. 1982)...............................................................................18

*Ellis v. Chao,*
336 F.3d 114 (2nd Cir. 2003) ............................................................................22

*Fowler v UPMC Shadyside,*
578 F.3d at 213 .................................................................................23

*Garcia, et al., v. Alticor, Inc*., *et al.,*
No. 1:20-cv-1078 (W.D. Mich. Aug. 23, 2022) ....................................37

*Garthwait v. Eversource Energy Co*.,
No. 3:20-CV-00902 (JCH), 2021 WL 4441939 (D. Conn. Sept. 28, 2021)............28

*Gonzalez v. Northwell Health,*
No. 20-cv-3256, 2022 WL 4639673 (E.D.N.Y. Sep. 30, 2022) ...................... 32, 34

*Gordon v. Mass Mutual*,
Case 13-30184, (D.Mass. June 15, 2016) .............................................16

*Hay v. Gucci America, Inc.*,
2018 WL 4815558 (D.N.J. Oct. 3, 2018) ..............................................30

*Hughes v. Northwestern Univ.*
63 F.4th 615 (7th Cir. 2023) ("*Hughes* II") ......................................*Passim*

*Hughes v. Northwestern Univ.*,
No. 19-1401 (May 25, 2021) ..........................................................21

*Hughes*, v. *Northwestern*
142 S.Ct. 737 (2022) ............................................................. 22, 23, 29

*Johnson et al. v. The PNC Financial Services Group, Inc. et al*.,
No. 2:20-CV-01493 (W.D. Pa. Mar. 31, 2022) ......................................30

*Lucente v. Int'l Bus. Machs. Corp*.,
10 F.3d 243, 258 (2d Cir. 2002)......................................................23

*Krutchen v. Ricoh USA, Inc*.,
No. 22-678, 2023 WL 3026705 (E.D. Pa. Apr. 20, 2023)......................................32

*Main v. Am. Airlines, Inc.*,
248 F.Supp.3d 786 (N.D. Tex. 2017) .................................................23

*McCool v. AHS Management Company, Inc.*,
2021 WL 826756 (M.D. Tenn. March 4, 2021) ........................................37

*McGowan v. Barnabas Health, Inc.*,
2021 WL 1399870 (D.N.J. Apr. 13, 2021) ...........................................30

*McNeilly et al. v. Spectrum Health Systems, et al.*,
No. 1:20-cv-870 (W.D. Mich. Dec. 20, 2022) .......................................37

*Miller v. Autozone*,
2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) ...................................37

*Moitoso et al. v. FMR, et al.*,
451 F.Supp.3d 189 (D.Mass. 2020) ............................................. 14, 15

*Moore et al. v. Humana, Inc. et al.*,
No. 3:21-cv-00232-RG, (W.D.Ky. Mar. 31, 2022) ...............................37

*In re M&T Bank Corp. ERISA Litig.*,
No. 16-CV-375 FPG, 2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018) ..................34

*Nicolas v. Trustees of Princeton Univ.*,
2017 WL 4455897 (D.N.J. Sept. 25, 2017) ...........................................30

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
709 F.3d 109 (2d Cir.2013).......................................................25

*In re Omnicom ERISA Litig.*,
No. 20-CV-4141 (CM), 2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021)............ 29, 34

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019)................................................. 19., 20

*Pension Ben Guar. Corp. ex rel. St. Vincent Catholic Medical Ctrs. Ret. Plan v. Morgan Stanley Investment Management*,
712 F.3d 705 (2nd Cir. 2013) .............................................. 20, 21, 23, 25

*Peterson v. Ins. Servs. Office*,
2021 WL 1382168 (D.N.J. Apr. 13, 2021) ..................................... 30, 40

*Pinnell v. Teva Pharmaceuticals USA, Inc.*,
2020 WL 1531870 (E.D. Pa. March 31, 2020) ....................................................30

*In re Polaroid ERISA Litig.*,
362 F. Supp. 2d 461 (S.D.N.Y. 2005) ...................................................40

*Ruilova v. Yale-New Haven Hosp., Inc.*,
No. 3:22-CV-00111-MPS, 2023 WL 2301962 (D. Conn. Mar. 1, 2023) ............. 27

*Sacerdote v. New York Univ.*,
9 F.4th 95, 106 (2d Cir. 2021), cert. denied,
142 S. Ct. 1112, 212 L. Ed. 2d 9 (2022) ..........................................Passim

*Savage v. Sutherland Glob. Servs., Inc.*,
521 F. Supp. 3d 308 (W.D.N.Y. 2021) ...................................................40

*In re Schering-Plough ERISA Litig.*,
2010 WL 2667414 (D.N.J. June 29, 2010) .............................................40

*Silva v. Evonik Corp.*,
2020 U.S. Dist. LEXIS 250206 (D.N.J. Dec. 30, 2020) .................................. 20, 30

*Singh v. Deloitte, LLP*,
2023 WL 4350650 (S.D.N.Y. July 5, 2023) ....................................... 22, 24, 31, 32

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ............................................. 32, 35, 36 ,37

*Spano v. Boeing*,
Case 06-743, (S.D. Ill. Dec. 30, 2014) ...................................................16

*Sweda v. Univ. of Pennsylvania*,
923 F.3d at 320 (3rd Cir. 2019) ...................................................*Passim*
*Tibble v. Edison Int'l*,
575 U.S. 523 (2015) ...................................................22

*Vellali v. Yale Univ.*,
308 F. Supp. 3d 673 (D. Conn. 2018) ........................................... 29, 34

*Young v. GM Inv. Mgmt. Corp.*,
325 Fed. Appx. 31 (2d Cir. 2009) ................................................................. 32, 33, 34

**Statutes**

28 U.S.C. § 1331 ............................................................................................................1

29 U.S.C. § 1001 ............................................................................................................1

29 U.S.C. § 1104(a)(1)(A) ..........................................................................................18

29 U.S.C. § 1104(a)(1)(B) .......................................................................................2, 18

29 U.S.C. § 1105(a) ....................................................................................................40

29 U.S.C. § 1291 ............................................................................................................1

29 U.S.C. § 1332(e)(1) ..................................................................................................1

Fed. R. Civ. Pro. 12(b)(6) ................................................................................*Passim*

**Other Sources**

401k Averages Book 20th Edition ..............................................................................28

Employee Retirement Income Security Act of 1974 ...................................................1

# JURISDICTIONAL STATEMENT

## A. District Court's Subject-Matter Jurisdiction

The district court had subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

## B. Court of Appeals' Jurisdiction

This Court has jurisdiction over this appeal pursuant to 29 U.S.C. § 1291 because the district court's judgment granting Defendants' Motion to Dismiss is a final judgment of the district court.

## C. Timeliness of Appeal

The district court's Memorandum Opinion and Order was issued on July 5, 2023, and the judgment was entered on July 5, 2023. APP14. Plaintiffs filed the Notice of Appeal on August 3, 2023. APP190.

## D.  Final Judgment

This appeal is from a final judgment that disposes of all parties' claims.

# STATEMENT OF THE ISSUE

Whether the District Court erred in determining the Plaintiffs Rupinder Singh, Jeffrey S. Popkin, Joni Walker, and Jenny Mark's (collectively "Plaintiffs") proposed First Amended Complaint ("FAC") failed to adequately plead plausible

claims for breach of ERISA's fiduciary duties for failing to adequately monitor the Deloitte 401(k) Plan's ("Plan") recordkeeping fees which resulted in excessive recordkeeping fees at the expense of the Plan's participants.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously.

## STATEMENT OF THE CASE

This case concerns the failure of Defendant-Appellees[1] each of whom served as a Plan fiduciary, to protect the interests of the Plan, its participants, and their beneficiaries in violation of Defendants' fiduciary obligations under ERISA. ERISA's duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Defendant-fiduciaries breached their duty of prudence by failing to adequately monitor and control the Plan's recordkeeping fees which resulted in the Plan and participants paying excessive fees.

---

[1] "Defendant-Appellees" or "Defendants" refers to Deloitte, LLP ("Deloitte"), The Board of Directors of Deloitte LLP. ("Board"), The Retirement Committee of Deloitte, LLP ("Committee"), and John Does 1-30.

# I.    Procedural History

Plaintiffs filed their original Complaint on October 13, 2021, APP32. On March 18, 2022, Defendants filed a Motion to Dismiss Plaintiffs' Complaint. APP61.   On January 13, 2023, the district court granted Defendant's motion to dismiss without prejudice. On February 27, 2023, Plaintiffs filed a Motion for Leave to File an Amended Complaint. APP83. On April 14, 2023, Defendants filed their Opposition to Plaintiffs' Motion for Leave to File and Amended Complaint. On April 28, 2023, Plaintiffs filed their Reply in Support of Plaintiffs' Motion for Leave to File an Amended Complaint. Both Plaintiffs and Defendants filed notices of supplemental authorities in support of their positions on Plaintiffs' motion.  On July 5, 2023, the District Court denied Plaintiffs' Motion for Leave to File an Amended Complaint and ordered the case closed.

## II.  Statement of Facts

### A. Overview of the Plan

At all times during the putative Class Period (October 13, 2015 through the date of judgment), the 401(k) Plan had at least $4.2 billion dollars in assets under management. APP92 (FAC ¶ 9).[2] At the end of fiscal year 2020 and 2019, the Plan had over $7.3 billion dollars and $6.5 billion dollars, respectively, in assets under

---

[2] Plaintiffs cite to their First Amended Complaint ("FAC") which was attached as Exhibit A to their Motion for Leave to File an Amended Complaint filed with the district court. APP89.

management that were/are entrusted to the care of the Plan's fiduciaries. *Id.* From 2015 to 2019 the plan had between 62,114 and 81,639 participants with account balances, making it eligible for some of the lowest fees on the market. APP93 (FAC ¶ 11).

## B. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA. APP105 (FAC ¶ 65). Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. APP105 (FAC ¶ 66). Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. APP105 (FAC ¶ 67). There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

A. Basic account recordkeeping (*e.g.* demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (*e.g.* phone, web);

C. Daily participant transaction accounting (*e.g.*, purchases, redemptions, exchanges);

D. Payroll service (*e.g.* hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (*e.g*., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (*e.g.* newsletters, web articles, standard communication materials);

I. Plan consulting (*e.g*., preapproved document services, operational materials);

J. Plan consulting (*e.g.* preapproved document services, operational compliance support).

These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services. APP106 (FAC ¶ 69). The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. APP106 (FAC ¶ 70). The cost

of providing recordkeeping services often depends on the number of participants in a plan. APP106 (FAC ¶ 71). Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. APP107 (FAC ¶ 73); *see also* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").[3]  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis. *Id.*[4] Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider. APP107 (FAC ¶ 74).

---

[3] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (last accessed November 3, 2023).

[4] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

## C. Much Information Relating to Direct Evidence of Fiduciary Misconduct Remains in Defendants' Sole Possession

The amount of total recordkeeping fees paid by 401(k) plans is not public information. Recordkeepers issue 408(b)(2) disclosures to plan sponsors and fiduciaries. These disclosures delineate the exact amounts plans pay to recordkeepers but are not filed publicly and are not otherwise available to plan participants. As a result, plaintiffs challenging the prudence exercised by plan fiduciaries must rely on circumstantial evidence at the pleading stage.

The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries. APP109 (FAC ¶ 78). Other information which is within the sole possession of Plan sponsors and not made available to plan participants has also not been made available to Plaintiffs, such as meeting minutes, documentation of fiduciary reviews, and recordkeeping agreements. APP109 (FAC ¶¶ 79-82). In an attempt to discover the details of the Plan's mismanagement, on October 6, 2020, the Plaintiffs wrote to Deloitte requesting, *inter alia*, meeting minutes from the Committee. APP110 (FAC ¶ 83). By Letter dated November 11, 2020, Deloitte denied Plaintiffs' request for these meeting minutes. *Id.*

Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. APP110 (FAC ¶ 84). But in most cases,

even that is not sufficient. *Id.* For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Walmart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer."). APP110 (FAC ¶ 85).

For purposes of the FAC, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other

authority. APP111 (FAC ¶ 86). Defendants' breaches of their fiduciary duties, relating to their overall decisionmaking, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants. APP111 (FAC ¶ 87).

## D. Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees

### 1. There is No Indication Defendants Conducted RFPs at Reasonable Intervals

As noted above, recordkeepers' 408(b)(2) disclosures are not available to plan participants. By the same token, recordkeepers' 408(b)(2) disclosures to *other* 401(k) plans are not available to Plan fiduciaries. Thus, Plan fiduciaries are not privy to the fees paid by other 401(k) plans to their recordkeepers. Accordingly, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a request for proposals ("RFP") from competing recordkeepers. APP111 (FAC ¶ 88).

Vanguard has served as the Plan's recordkeeper since 2004 and throughout the Class Period. APP111-APP112 (FAC ¶¶ 89, 92). In 2020, Vanguard, was in the top 10 of recordkeepers as measured by assets being recordkept. APP111 (FAC ¶ 89). At any point in the Class Period, the Plan's fiduciaries could have opted to conduct an RFP to any recordkeeper in the top 10 and capable of providing lower recordkeeping fees. APP112 (FAC ¶ 90). The recordkeepers in the top ten are all

capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. APP112 (FAC ¶ 91).

The fact that the Plan has stayed with the same recordkeeper since at least 2004, paid outrageous amounts for recordkeeping from 2015 to 2017 (nearly 3x the amount similarly-situated plans paid), and paid an increasing amount in recordkeeping fees from 2018 to the present, means there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. APP112 (FAC ¶ 92).

2. **Market Surveys, Form 5500s, and other Sources Noted Below are Reliable Sources for Participants to Determine Whether the Plan's Recordkeeping Fees are Unreasonable**

As demonstrated in the charts below, using a mixture of revenue sharing and direct costs to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled the Plan's participants with above-market administrative and recordkeeping fees throughout the Class Period. APP112 (FAC ¶ 93).

The Plan's per participant total administrative and recordkeeping fees were as follows:

| 401(k) Plan -- Per Participant Costs | | | | | |
|---|---|---|---|---|---|
| Year | Participants | Direct Costs | Indirect Costs[5] | Total | Per Participant |
| **2019** | 81,639 | $5,326,534 | $54,789 | $5,381,323 | $65.92 |
| **2018** | 76739 | $5,187,016 | $208,569 | $5,395,585 | $70.31 |
| **2017** | 70264 | $3,620,793 | $602,551 | $4,223,344 | $60.11 |
| **2016** | 65814 | $4,044,412 | $562,473 | $4,606,885 | $70.00 |
| **2015** | 62114 | $2,871,393 | $829,049 | $3,700,442 | $59.58 |

APP113 (FAC ¶ 95). When looking at just *direct* costs, the Plan's per participant costs were as follows:

| Year | Participants | Direct Costs | Per Participant |
|---|---|---|---|
| **2019** | 81,639 | $5,326,534 | $65.24 |
| **2018** | 76739 | $5,187,016 | $67.59 |
| **2017** | 70264 | $3,620,793 | $51.53 |
| **2016** | 65814 | $4,044,412 | $61.45 |
| **2015** | 62114 | $2,871,393 | $46.23 |

The above fees, whether looking at just direct payments made to Vanguard or both direct payments and indirect payments, were astronomical when benchmarked against similar plans. For purposes of the FAC, Plaintiffs compare only the direct

---

[5] Indirect costs are estimated by identifying the funds in the Plan that pay revenue sharing and calculating those amounts using the most recent expense ratios for those funds. This number is potentially conservative as additional revenue sharing will likely be uncovered during discovery.

costs paid to Vanguard with the costs paid by other plans to illustrate the excessive nature of the RKA fees which were more than double a reasonable rate, even just looking at the direct costs. APP113 (FAC ¶ 96). For purposes of determining whether the Plan's fees were reasonable, it is significant to consider the fees paid by the PSP participants which upon information and belief was also recordkept by Vanguard:

| Year | Participants | Direct Costs | Per Participant |
|------|------|------|------|
| **2019** | 7388 | $1,533,491 | $207.57 |
| **2018** | 7193 | $1,427,413 | $198.44 |
| **2017** | 6888 | $1,221,118 | $177.28 |
| **2016** | 6710 | $995,753 | $148.40 |
| **2015** | 6492 | $565,456 | $87.10 |

APP113 (FAC ¶ 97). During the Class Period, the combined Plans had a low of approximately 68,606 total participants in 2015 to a high of 89,027 total participants in 2019 making it eligible for some of the lowest fees on the market. APP114 (FAC ¶ 99).

Other objective evidence points to the unreasonableness of the Plan's fees. Looking at recordkeeping costs for plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes plans having more than 30,000 participants:

| Comparable Plans' R&A Fees Paid in 2019[6] | | | | | |
|---|---|---|---|---|---|
| **Plan Name** | **Number of Participants** | **Assets Under Management** | **Total R&A Costs[7]** | **R&A Costs on Per-Participant Basis** | **Record-keeper** |
| Publicis Benefits Connection 401K Plan | 48,353 | $3,167,524,236 | $995,358 | **$21** | Fidelity |
| Deseret 401(k) Plan | 34,938 | $4,264,113,298 | $773,763 | **$22** | Great-West |
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | **$25** | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | **$27** | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 | $3,793,834,091 | $1,526,401 | **$33** | Vanguard |
| Danaher Corporation & Subsidiaries Savings Plan | 33,116 | $5,228,805,794 | $1,124,994 | **$34** | Fidelity |

APP115 (FAC ¶ 104).

---

[6] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

Thus, the Plan, with over 60,000 participants and billions of dollars in assets in 2019, should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present. It is particularly noteworthy that Vanguard, who is the recordkeeper for the Plans, was the recordkeeper for two of the plans identified above where recordkeeping fees were dramatically less than for the Plan. *Id.*

### *The Fidelity Stipulation*

Fidelity is a recordkeeper that was within Vanguard's peer group at all relevant times. In a recent lawsuit where Fidelity's multi-billion dollar plan with at least 58,000 participants- like the Plan- the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020). APP117 (FAC ¶ 106). Specifically, Fidelity stipulated as follows:

---

[7] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that *Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year*. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

The signifiance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for RKA fees as low $14 and up to $21 per participant. APP117 (FAC ¶ 108).

### *Market Surveys Demonstrate the Unreasonableness of the Plan's RKA Fees*

Another source of data that underscores the unreasonableness of the RKA costs in this case is data released by NEPC, a consulting group, which recently conducted its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report ("NEPC Report"), which took a survey of various defined contribution plan fees.[8] APP117-APP118 (FAC ¶ 109). The sample size and respondents included 121

---

[8] Available at
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf
(last accessed November 3, 2023).

Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants. *See id.;* NEPC Report at 1.

NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly over $40 per participant recordkeeping, trust and custody fees. APP118 (FAC ¶ 110); NEPC Report at 10. The worst performing plans reviewed by the NEPC with over 15,000 participants paid no more than $60 per participant, but clearly Deloitte should have been able to negotiate a fee well below this mark. *Id.* When considering both the direct and indirect costs paid for recordkeeping, Deloitte paid more than $60 per participant for RKA costs. *Id.*

Finally, the Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day.[9] APP118 (FAC ¶ 111).

---

[9] Case law is in accord that large plans can bargain for low recordkeeping fees. *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184,

In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. APP118-APP119 (FAC ¶ 112). To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. *Id.*

Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. APP119 (FAC ¶ 113).

## SUMMARY OF THE ARGUMENT

Plaintiffs brought this action on behalf of current and former employees of Deloitte, LLP. ("Deloitte") who during the putative Class Period (October 13, 2015 through the date of judgment) participated in the Plan, which is governed by ERISA.

---

Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). As such, Defendants were required to ensure that the Plan paid no more than reasonable compensation for any of the recordkeeping and administrative services provided to the Plan and ensure the Plan was administered in accordance with the terms of ERISA.

Here, Defendants breached their fiduciary duties by saddling the Plan and its participants with exorbitantly high fees for the Plan's recordkeeping and administrative services. The FAC alleges the same type of circumstantial facts to support a plausible claim for excessive recordkeeping costs in accordance with the pleading requirements of the Second Circuit. Despite Plaintiffs' well-pled allegations, the district court dismissed Plaintiffs' FAC.

Plaintiffs submit that the District Court erred for several reasons. First, the District Court erred in granting the motion to dismiss by applying an improper standard of review for a Rule 12(b)(6) motion to dismiss. The District Court did not "construe [the FAC] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. New York Univ.*, 9 F.4th 95, 106 (2d Cir. 2021), cert. denied, 142 S. Ct. 1112, 212 L. Ed. 2d 9

(2022); *see also Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Instead, the District Court, engaged in a fact-finding determination, improperly questioning the well-pled factual allegations. Second, the District Court erred in failing to consider the considerable circumstantial evidence that the Plaintiffs pled showing that the Defendants breached their fiduciary duties, as required under the prevailing "holistic" approach. *Sacerdote*, 9 F.4th at 109, n. 49 (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d at 320, 331 (3rd Cir. 2019). Third, the District Court erred in holding that Plaintiffs failed to adequately plead "information as to the type and quality of the services" when Plaintiff did plead this information in accordance with the pleading standards of the Second Circuit and in circuit courts throughout the country. *Hughes v. Northwestern Univ.* 63 F.4th 615, 632 (7th Cir. 2023) ("*Hughes II*").

Therefore, the District Court erred in dismissing plaintiffs' recordkeeping claim, and this Court should reverse the District Court's decision granting Defendants-Appellees' motion to dismiss and remand this case to the District Court for further proceedings on the merits.

## STANDARD OF REVIEW

The Second Circuit exercises plenary review of a district court's order granting a Rule 12(b)(6) motion to dismiss a complaint. *Palin*, 940 F.3d at 809.

When considering a motion to dismiss under Rule 12(b)(6), a court takes the factual allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiffs. *Sacerdote*, 9 F.4th at 106; *Palin*, 940 F.3d at 809. Of particular importance here, in cases alleging imprudent fiduciary process, the Second Circuit agrees with the Eighth Circuit's holding in *Braden* that "[r]equiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party." *Sacerdote*, 9 F.4th at 108 (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597(8th Cir. 2009)).

The reason is simple. Plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598. The Court must employ a "holistic approach" to evaluate an ERISA complaint. *Sacerdote*, at FN 49 (citing *Sweda*, 923 F.3d at 331; *Braden*, 588 at 598). Likewise, the "assessment of any particular complaint is a 'context-specific task.'" *Id.* (citing *Pension Ben Guar. Corp. ex rel. St. Vincent Catholic Medical Ctrs. Ret. Plan v. Morgan Stanley Investment Management*, 712 F.3d 705, 718 (2nd Cir. 2013)); *see also Silva v. Evonik Corp.*, 2020 U.S. Dist. LEXIS 250206, at *11-12 (D.N.J. Dec. 30, 2020) (citation omitted) (stating that courts should "remain mindful that '[m]any allegations concerning fiduciary conduct . . . are inherently factual question[s]."").

Courts recognize that in cases alleging imprudent fiduciary process, "a claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Pension Ben Guar. Corp.*, 712 F.3d at 718; *see also Main v. Am. Airlines, Inc.*, 248 F.Supp.3d 786, 792 (N.D. Tex. 2017) (quoting *Braden*, 588 F.3d at 596) (acknowledging same).

The Supreme Court's recent decision in *Hughes v. Northwestern Univ.* reinforces the above pleading standard. *Hughes* vacated a decision that was at odds with the Third and Eighth Circuit's decisions in *Sweda* and *Davis, et al. v. Washington U. See* Br. for the United States as Amicus Curiae at 17, *Hughes v. Northwestern Univ.*, No. 19-1401 (May 25, 2021) ("the decision below conflicts with decisions of the Third and Eighth Circuits, both of which have held that very similar complaints—alleging that defendants offered retail-class investment shares instead of available institutional-class shares, and paid excessive recordkeeping fees in universities' Section 403(b) plans— stated claims for relief under ERISA."). While decided after the filing of the above cited authority, prior to the Supreme Court's decision in *Hughes*, the Second Circuit joined the Third and Eighth Circuit's precedent in *Sacerdote*.

Additionally, *Hughes* implores lower courts to apply the teachings of *Tibble v. Edison Int'l*, 575 U.S. 523, 529-530 (2015) where the Supreme Court "interpreted ERISA's duty of prudence in light of the common law of trusts and determined that 'a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones.'" *Hughes*, v. *Northwestern* 142 S.Ct. 737, 741 (2022) (quoting *Tibble*, 575 U.S. at 530). This duty includes controlling plan costs. *See* APP91 (SAC ¶ 4) (citing Uniform Prudent Investor Act, § 7). Lastly, the *dicta* in *Hughes* that lower courts must give consideration to "reasonable judgments a fiduciary may make" at best suggests the scope of "judgments" ought to be taken up at summary judgment.

## ARGUMENT

**I. Defendants Breached Their Fiduciary Duties In Failing To Monitor the Plan's Recordkeeping Fees**

**A. The District Court Erred In Denying Plaintiffs' Motion to File an Amended Complaint By Applying An Improper Standard Of Review Under a Rule 12(b)(6) Motion to Dismiss to the Proposed First Amended Complaint**

The District Court erred in denying Plaintiffs' Motion to File an Amended Complaint. Specifically, the District Court erred in finding that the proposed amendment would be "futile" because the amended pleading could not withstand a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6). *Singh v. Deloitte, LLP*, 2023 WL 4350650 at *2 (S.D.N.Y. July 5, 2023) citing *Ellis v. Chao*, 336 F.3d 114,

127 (2nd Cir. 2003); *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

The District Court did not view the "allegations as a whole," *Hughes*, 142 S. Ct. at 739, or "draw[] all reasonable inferences in the plaintiffs' favor." *Sacerdote*, 9 F.4th at 106-107. Courts do not require an ERISA plaintiff "to rule out every possible lawful explanation for the conduct he challenges." To do so "would invert the principle that the complaint is construed most favorably to the nonmoving party" on a motion to dismiss." *Id.* at 108 (citing *Braden*, 588 F.3d at 597). Indeed, a complaint should *not* be "parsed piece by piece to determine whether each allegation, in isolation, is plausible" since participants do not have direct evidence of how fiduciaries reached their decisions. *Sweda*, 923 F.3d at 331 (quoting *Braden*, 588 F.3d at 594). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable and a recovery is very remote and unlikely." *Fowler*, 578 F.3d at 213.

Additionally, "a claim for breach of the duty of prudence will 'survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed' or 'that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.'" *Sacerdote*, 9 F.4th at 108 (quoting *PBGC*, 712 F.3d. at 718).

"[M]any allegations concerning fiduciary conduct, such as reasonableness of compensation for services are inherently factual questions" and should not be addressed at the motion to dismiss stage. *Sweda*, 923 F.3d at 329. The job of the court is not to determine whether the alleged facts are actually true, but rather to determine whether, if they are true, the plaintiffs have plausibly stated a claim upon which relief can be granted. *Id.*

The issue of whether the RKA fees are reasonable is ultimately an issue of fact. *Id.* Here, the district court improperly engaged in fact finding in rejecting plaintiffs well pled allegations.

According to the District Court, Plaintiffs' "bare 'price tag to price tag comparison' does not help plaintiffs because 'without information as to the type and quality of the services provided," there is no basis on which to infer the defendants' imprudence." *Singh*, 2023 WL 4350650 at *4. Plaintiffs submit that not only does this statement misrepresent Plaintiffs' claims, but the court's rejection of Plaintiffs' comparisons constitutes improper factfinding that is not appropriate for a motion to dismiss.

Applying the pleading standard set forth by the Supreme Court and the Second Circuit, the District Court erred in denying Plaintiffs' Motion to File an Amended Complaint. Taking Plaintiffs' well-pleaded factual allegations as true and drawing reasonable inferences in their favor, Plaintiffs' FAC contains sufficient factual

matter to state plausible claims that Defendants breached ERISA's duty of prudence. These facts are discussed below. Therefore, the District Court erred in dismissing Plaintiffs' recordkeeping claim, and this Court should reverse the District Court's decision denying Plaintiff-Appellants' Motion to File an Amended Complaint and remand this case to the District Court for further proceedings on the merits.

## B. The District Erred In Failing To Consider the Considerable Circumstantial Evidence That The Plaintiffs Pled Showing that The Defendants Breached Their Fiduciary Duties.

The District Court erred in failing to consider the considerable circumstantial evidence that the Plaintiffs pled showing that the Defendants breached their fiduciary duties. Under *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, Plaintiffs need not directly allege how defendants mismanaged the Plan so long as there is "substantial circumstantial evidence from which the District Court could 'reasonably infer' that a breach had occurred." 712 F.3d at 718. "[I]f the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a "reasonable inference" that the defendant committed the alleged misconduct." *Id.* (quoting *Iqbal*, 556 U.S. at 678, (S.Ct. 2009)). Likewise, "courts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d

Cir. 2013). "[W]e are cognizant that 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.' [] So, as is true in many contexts, a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *Sacerdote,* 9 F.4th at 107 (citation omitted).

The FAC pleads ample circumstantial evidence to support its claims that Defendants breached their fiduciary duty. The FAC alleges that Defendants breached their duty of prudence by failing to have a process where Defendants conduct Requests for Proposals (RFPs) at reasonable intervals to ensure that the 401(k) Plan's RKA fees were reasonable. APP111-APP112 ¶¶ 88-92. The FAC cites to a stipulation reached by a recordkeeper in the Plan's recordkeeper's (Vanguard) peer group, Fidelity, agreeing that the value of its recordkeeping services ranged from $14 to $21 from 2014 to 2017. The FAC also adds references to market surveys as an additional source of data that underscores the unreasonableness of the 401(k) Plan's RKA fees. APP117-APP119 ¶¶ 109-113. The FAC further alleges that Defendants failed to leverage the PSP plan's number of participants to obtain lower RKA fees for the Plan. APP93 ¶ 13. Finally, the FAC presents tables comparing the direct costs of the Plan to the direct costs of six comparator plans which demonstrate

that the fees paid by the Plan far exceeded other comparable plans APP112-APP113 ¶¶ 94-97, APP115 ¶ 104.

Courts across the Second Circuit have relied on similar evidence to deny motions to dismiss under FED. R. CIV. P. 12(b)(6) in cases making the same allegations as Plaintiffs here.

In *Ruilova v. Yale-New Haven Hosp., Inc*., plaintiffs alleged the defendants breached their fiduciary duties by allowing the plan to pay excessive recordkeeping fees. No. 3:22-CV-00111-MPS, 2023 WL 2301962, at *16 (D. Conn. Mar. 1, 2023). Plaintiffs alleged that "the market for defined contribution RK & A services is extremely competitive for large plans, that informed fiduciaries are aware of this and will leverage a large plan's participant count to obtain lower RK & A fees by regularly soliciting competitive bids from other recordkeepers…" *Id.* Plaintiffs calculated recordkeeping fees using the plan's form 5500 and compared the fees to similarly sized plans that paid less than the plan. *Id.* The court held that "[f]rom these calculations and comparisons, Plaintiffs infer that Defendants paid more than comparable plans for the same services because they failed to use a prudent process involving 'examination, comparison, or benchmarking of the RK & A fees of the Plan to those of similarly sized defined contribution plans.' Courts in this Circuit have consistently found that allegations of this kind are sufficient to state a claim." *Id.* (internal citations omitted).

*Carrigan v. Xerox Corp.* involved similar claims regarding excessive recordkeeping fees. No. 3:21-CV-1085 (SVN), 2022 WL 1137230, at *5-7 (D. Conn. Apr. 18, 2022). Plaintiffs alleged that comparable plans paid less in recordkeeping fees than the plan and that despite the plan's size, it "did not attempt to leverage a competitive recordkeeping fee from the affiliated recordkeepers or a competitor." *Id.* Defendant argued that Plaintiffs did not allege specific details about the fiduciaries' process, but the court stated that "[p]laintiffs need not include such specific allegations." Relying on *Sacerdote*, the court held that "[p]laintiffs' circumstantial allegations allow the Court to 'reasonably infer' that the process by which the Committee hired the recordkeepers 'was flawed,' and that a reasonably prudent plan fiduciary would have handled such circumstances differently. *Id.* Again, Plaintiffs here make virtually identical allegations.

The plaintiffs in *Garthwait v. Eversource Energy Co*., alleged that the defendants failed to use the plan's "considerable power to bargain for lower fees." No. 3:20-CV-00902 (JCH), 2021 WL 4441939, at *8 (D. Conn. Sept. 28, 2021). Plaintiffs, using one sample year of comparison, alleged that this failure resulted in fees higher than the "2017 industry averages for smaller plans with less negotiating power, according to the 401k Averages Book 20th Edition." *Id.* Defendants argued that plaintiffs could not rely on the 401k Averages Book, but the court disagreed: "[a]t this stage, however, the court accepts Plaintiffs' well-pleaded allegations as

true. Thus, these factual disputes are properly resolved after discovery and not at this early stage of litigation." *Id.* (internal citations omitted). While the court's decision preceded the Supreme Court's ruling in *Hughes v. Northwestern University*, the court noted that "[a]t the pleading stage, courts generally have denied motions to dismiss claims that fees were excessive and that fiduciaries failed to negotiate for or seek lower fees…" *Id.* Ultimately, the Supreme Court's decision in *Hughes*, and the Seventh Circuit's interpretation of that ruling reinforce this court's conclusion.

Multiple cases throughout the Second Circuit are in accord. *See In re Omnicom ERISA Litig.*, No. 20-CV-4141 (CM), 2021 WL 3292487, at *15 (S.D.N.Y. Aug. 2, 2021) ("Plaintiffs' essential allegation is that, because the Omnicom Plan is much larger than the ones evaluated in the Averages Book, it has a stronger bargaining position than those plans and so should have been able to secure a much lower per-participant fee. Whether Omnicom actually would have been able to secure a lower rate … is a matter reserved for later."); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 685 (D. Conn. 2018) (finding plaintiffs' allegations that "defendants breached their duty of prudence by failing to employ strategies that would lower recordkeeping fees, such as installing a system to monitor and control fees; periodically soliciting bids in order to compare cost and quality of recordkeeping services; leveraging the Plan's "jumbo" size to negotiate for cheaper recordkeeping fees; consolidating from two recordkeepers to one; and implementing

a flat fee rather than a revenue–sharing structure" sufficient to deny motion to dismiss); *Cunningham v. Cornell Univ.*, No. 16-CV-6525, 2017 WL 4358769, at *5 (S.D.N.Y. Sept. 29, 2017) (same).[10]

Plaintiffs here present more circumstantial evidence than plaintiffs in most of these cases. As discussed above, not only do Plaintiffs allege that the Defendants failed to leverage the Plan's substantial size to negotiate lower fees, Plaintiffs list six comparator plans, each of which was smaller than the Plan and had *less negotiating power*, yet still had lower recordkeeping fees than the Plan. APP115 ¶104. In addition, Plaintiffs allege that the Plan failed to regularly conduct RFPs to identify recordkeepers that would charge lower fees, that the Plan paid fees above industry averages according to market surveys, that a recordkeeper similar in size to Vanguard (Fidelity) agreed to reasonable fees far lower than those charged by

---

[10] Multiple district courts in the Third Circuit have also reached the same conclusions on similar evidence. *See Johnson et al. v. The PNC Financial Services Group, Inc. et al.*, No. 2:20-CV-01493, at 11 (W.D. Pa. Mar. 31, 2022) (upholding recordkeeping fee claims when "Plaintiffs allege that the Plan's average per participant, per year recordkeeping fee of $52.58 is 'unreasonable and excessive relative to the services received[,]' especially when compared to the four other 401(k) plans noted within the Plaintiffs' benchmark table."); *Peterson v. Ins. Servs. Office*, 2021 WL 1382168, at *5 (D.N.J. Apr. 13, 2021) (finding "Plaintiffs sufficiently allege a plausible breach of fiduciary duties claim" by alleging defendants failed to monitor and control recordkeeping fees); *Nicolas v. Trustees of Princeton Univ.*, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017) (same); *Hay v. Gucci America, Inc.*, 2018 WL 4815558, at * 8 (D.N.J. Oct. 3, 2018) (same); *McGowan v. Barnabas Health, Inc.*, 2021 WL 1399870, at *5 (D.N.J. Apr. 13, 2021) (same); *Silva v. Evonik Corp.*, 2020 U.S. Dist. LEXIS 250206, at *19 (D.N.J. Dec. 30, 2020) (same); *Pinnell,* 2020 WL 1531870, at *5-6 (same).

Vanguard during the same time period as the Class Period here, and that Defendants should have sought to combine the 401(k) and the PSP plans to negotiate even lower fees.

The overwhelming weight of authority in the Second Circuit holds that these allegations, taken together, are sufficient to defeat a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6). However, the District Court characterized Plaintiffs' allegations as a "bare 'price tag to price tag' comparison" *Singh*, 2023 WL 4350650 at *4. The District Court erred in failing to consider the considerable circumstantial evidence that the Plaintiffs pled showing that the Defendants breached their fiduciary duties as detailed above. Therefore, this Court should reverse the District Court's decision denying Plaintiff-Appellants' Motion to File an Amended Complaint and remand this case to the District Court for further proceedings on the merits.

### C. The District Court Erred In Dismissing Plaintiffs' FAC Purportedly Because The Plaintiffs Did Not Plead Information As To The Type and Quality Of The Services Provided.

After disregarding Plaintiffs' multiple examples of imprudence, the District Court denied Plaintiffs' Motion to File an Amended Complaint because "the proposed amended complaint never alleges what services Vanguard actually provided to the Plan …" and "[i]t does not go further to allege 'what recordkeeping services the 40l(k) Plan received from Vanguard,' nor does it allege 'what

recordkeeping services the comparator plans received from Vanguard." *Singh*, 2023 WL 4350650 at *3 (internal citations omitted). Relying on two out of circuit cases, the District Court then held "[a]ccordingly, the amended complaint still fails to allege that 'the recordkeeping fees were excessive relative to the services rendered.'" *Id.*[11] Not only did the District Court misapply the applicable law in the Second Circuit, it failed to recognize that Plaintiffs did sufficiently plead information regarding the type and quality of services provided.

The District Court's holding relies primarily on cases from the Seventh Circuit (*Albert*) and the Sixth Circuit (*Smith*). *Id.* It also relies heavily on *Krutchen v. Ricoh USA, Inc*., a case from the Eastern District of Pennsylvania, currently on appeal in the Third Circuit. No. 22-678, 2023 WL 3026705 (E.D. Pa. Apr. 20, 2023).

The only in-circuit case the District Court cites is *Gonzalez v. Northwell Health,* No. 20-cv-3256, 2022 WL 4639673 (E.D.N.Y. Sep. 30, 2022). *Id.* The court in *Gonzalez* relied on the Second Circuit's decision in *Young v. GM Inv. Mgmt. Corp*., 325 Fed. Appx. 31, 33 (2d Cir. 2009) for the proposition that plaintiffs must "allege that the fees were excessive relative to the services rendered" (citation omitted). *Gonzalez*, 2022 WL 4639673 at *10. But the District Court misinterprets this requirement.

---

[11] Citing *Albert v. Oshkosh Corp*., 47 F.4th 570, 580 (7th Cir. 2022) and *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022).

The court in *Carrigan v. Xerox Corp.* analyzed the *Young* opinion in a similar ERISA excessive fee case where the defendants- like here- argued that plaintiffs must specifically identify the services rendered by the recordkeeper and comparator plans' recordkeepers. No. 3:21-CV-1085 (SVN), 2022 WL 1137230, at *5-6 (D. Conn. Apr. 18, 2022). The court found that "[u]pon closer inspection, however, this Court is not convinced that *Young* controls Plaintiffs' claim." *Id.* at *7. The court determined that the *Young* court analogized an ERISA claim of excessive fees to a similar claim under the Investment Company Act ("ICA"). *Id.* Because the ICA implicated a different statutory scheme and had a different purpose, the analogy was inappropriate. *Id.* The court stated:

> *Young*'s analogy of the ICA to ERISA does not govern this motion. Accordingly, the relative sparsity of Plaintiffs' allegations concerning the specific services rendered by Xerox HR, Conduent, and the comparator recordkeepers is not fatal to their claim of excessive recordkeeping fees. Rather, Plaintiffs' general allegations that the comparator recordkeepers would have provided services "of like or superior quality" to the affiliated recordkeepers, as well as Plaintiffs' suggestion that recordkeeping services are fairly standardized, support their claim that the fees charged by the affiliated recordkeepers were excessive. These allegations—in addition to the more specific allegations regarding the recordkeepers' affiliation with Xerox, the dramatic increase in fees, the competitive nature of the market for recordkeepers, the specific fees charged by the comparators for similarly sized plans, and the Committee's failure to employ what would have been considerable bargaining power to leverage a competitive fee—considered together, plausibly state a claim that a reasonable fiduciary in Defendants' position would have conducted an adequate investigation into the prudence of retaining the affiliated recordkeepers and, accordingly, would have acted differently.

*Id.* (citations omitted).  The court noted that other courts within the Second Circuit had reached similar conclusions. *Id.*; s*ee In re M&T Bank Corp. ERISA Litig.,* No. 16-CV-375 FPG, 2018 WL 4334807, at *8 n.10 (W.D.N.Y. Sept. 11, 2018); *Vellali*, 308 F. Supp. 3d at 684 n.2.  In short, the District Court's reliance on *Gonzalez* (and, by extension, the Second Circuit's decision in *Young*) to impose a heightened pleading standard in regard to recordkeeping services is misplaced.

Indeed, a decision out of the Southern District of New York noted that "[t]he overwhelming majority of judges in this district do not require that a plaintiff allege why recordkeeping and administrative fees are excessive in relation to the 'specific services' the Plan provided; ***and the trend in this district has been to defer deciding whether certain funds are appropriate comparators until after discovery***." *See In re Omnicom ERISA Litig*., 2021 WL 3292487 at *15 (emphasis added).

Likewise, the District Court's distinguishing of *Hughes II* is equally misplaced.  *Singh*, 2023 WL 4350650 at *4-5. On remand from the Supreme Court, the Seventh Circuit in *Hughes v. Nw. Univ,* 63 F.4th 615 (7th Cir. 2023) held that nearly identical allegations alleging that recordkeeping services are fungible properly alleges a breach of the defendants' fiduciary duties.

One of the issues in *Hughes* was whether plaintiffs adequately plead that defendants violated the duty of prudence by failing to monitor and control the fees they paid for recordkeeping. *Id*. The Seventh Circuit discussed at length the pleading

standard for the duty of prudence following the Supreme Court's decision in *Hughes*, 142 S. Ct. 737 (2022). *Id.* at 623-631. The plaintiffs in *Hughes* pled that the plaintiffs were subject to unreasonable recordkeeping fees. *Id.* "Plaintiffs assert that $35 was a reasonable per participant fee '[b]based on the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the number of participants in the Plans…, and the recordkeeping market." *Id.*

The Seventh Circuit then discussed its previous holding in *Albert* and its interpretation of *Smith*, and found that the plaintiffs' allegations satisfied the holdings of both cases. *Hughes* F.4th at 631-632. The Seventh Circuit noted that in *Albert*, they affirmed dismissal of recordkeeping claims where "the plaintiff pleaded that the relevant ERISA plan paid an average of $87 per participant in recordkeeping fees despite a reasonable fee being $40 per participant based on what comparator funds paid." *Id.* The court noted that *Albert* "emphasized the lack of 'allegations as to the quality or type of recordkeeping services the comparator plans provided.'" *Id.* at 631. The Seventh Circuit then distinguished the plaintiff's claims in *Hughes* from *Albert* and held that the plaintiffs adequately plead that the recordkeeping fees were excessive relative to the services rendered. *Id.* at 632. The court stated the following:

> Unlike in *Albert*, plaintiffs here assert "[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the Plans." So, plaintiffs maintain that the quality or type of recordkeeping services provided by competitor providers are comparable to that provided by Fidelity and TIAA. **Plaintiffs also plead that because**

**recordkeeping services are "commoditized ... recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plans."** In short, plaintiffs allege that recordkeeping services are fungible and that the market for them is highly competitive. Plaintiffs also contend that $35 per participant was a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the Plans' features. *Unlike the plaintiffs in CommonSpirit Health*, **plaintiffs plead that the fees were excessive relative to the recordkeeping services rendered.** *See* **37 F.4th at 1169.**

*Id.* (Emphasis added).

The District Court also distinguished *Hughes II* because the plaintiffs in that case alleged that defendants failed to consolidate two recordkeepers, which is not the case here. *Singh*, 2023 WL 4350650 at *4-5. But failure to consolidate was not the *only* allegation made by the *Hughes* plaintiffs. Like Plaintiffs here, the *Hughes* plaintiffs also alleged that defendants failed to conduct competitive bidding for recordkeeping services and failed to use the plan's size to negotiate for lower fees. *Hughes*, 63 F.4th at 633 (stating "Count III is not limited to a failure to consolidate recordkeepers. It includes a claim that Northwestern failed to mitigate excessive recordkeeping fees in several ways."). Thus, while not controlling, *Hughes II* offers strong persuasive authority.

Here, despite being out of circuit cases, the Plaintiffs easily satisfy the pleading requirements of *Albert* and *Smith* as clarified by the Seventh Circuit in

*Hughes*.[12] Like in *Hughes*, here, Plaintiffs' FAC make multiple allegations regarding

the recordkeeping services provided:

- Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. ¶66
- Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. ¶67
- There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

  A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);
  B. Multi-channel participant and plan sponsor access (e.g. phone, web);
  C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

---

[12] Although *Hughes* is a Seventh Circuit opinion and *Smith* is a *Sixth* Circuit opinion, district courts in the Sixth Circuit are in line with *Hughes'* interpretation of *Smith* and have consistently upheld nearly identical recordkeeping claims. *See*, e.g, *Moore et al. v. Humana, Inc. et al*., No. 3:21-cv-00232-RG, slip op. (W.D.Ky. Mar. 31, 2022) (upholding allegations of excessive recordkeeping and administration costs where "Plaintiffs include a chart comparing similarly situated plans, including a comparison of number of participants, amount of assets, and recordkeeping fees paid."); *Moore et al. v. Humana*, No. 3:21-cv-232 (W.D. Ky. Dec. 2, 2022) (Order denying motion for reconsideration); *Garcia, et al., v. Alticor, Inc*., *et al.,* No. 1:20-cv-1078 (W.D. Mich. Aug. 23, 2022) (order denying motion for reconsideration); *McNeilly et al. v. Spectrum Health Systems, et al.,* No. 1:20-cv-870 (W.D. Mich. Dec. 20, 2022) (order denying motion for reconsideration); *Allison v. L Brands, Inc.,* 2021 WL 4224729, at *8 (S.D. Ohio Sept. 16, 2021) (upholding excessive fee claims); *McCool v. AHS Management Company, Inc.*, 2021 WL 826756 (M.D. Tenn. March 4, 2021) (same); *Davis v. Magna Int'l of America, Inc.,* 2021 WL 1212579 (E.D. Mich. March 31, 2021); *Cassell v. Vanderbilt*, 285 F.Supp.3d 1056, 1061 (M.D. Tenn. 2018) (granting in part and denying in part defendants' motion to dismiss allegations of excessive fees); *Disselkamp, et al. v. Norton Healthcare, Inc. et al.,* 2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) (same); *Miller v. Autozone,* 2020 WL 6479564, at * 8-10 (W.D. Tenn. Sept. 18, 2020) (denying in toto motion to dismiss excessive fee claims).

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);
E. Participant tax reporting services (e.g., IRS Form 1099-R);
F. Participant confirmations, statements, and standard notices;
G. Plan-level reporting and annual financial package (excluding IRS Form 5500);
H. Participant education (e.g. newsletters, web articles, standard communication materials);
I. Plan consulting (e.g., preapproved document services, operational materials);
J. Plan consulting (e.g. preapproved document services, operational compliance support).
¶68

- These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. ¶69
- The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. ¶70
- The cost of providing recordkeeping services often depends on the number of participants in a plan. ¶71
- Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per participant basis. ¶73

Plaintiffs' comparator plans constitute a proper comparison because, as alleged in the FAC, all large plans offer roughly the same base services. APP114 (FAC ¶ 100). Furthermore, all the comparator plans were selected based on the most important factor in determining recordkeeping costs – plan participant size. Here, all of the comparator plans were large plans with roughly the same size or less participants than in the Plan. APP115 (FAC ¶¶ 104). This is significant because, as alleged in the FAC, recordkeeping expenses are driven by the number of participants

in a plan. APP106; APP107 (FAC ¶ 71, 73). Despite having more participants than the six comparator plans, the Plan's recordkeeping costs were significantly higher than the comparator plans in the same timeframe. APP112-APP113; APP115 (FAC ¶¶ 94, 95, 104). In 2019, the per-participant recordkeeping fee for the Plan was $65.92, whereas the per participant recordkeeping fees for the comparator plans ranged from $21-$34. APP112, APP115 (FAC ¶ 94, 104).

Thus, Plaintiffs' Recordkeeping allegations satisfy even the strictest circuit courts in the country that require plaintiffs to plead facts regarding services rendered by comparator recordkeepers. But just as important to note, Plaintiffs do not have access to recordkeeping agreements entered into by other plan fiduciaries because they are not publicly available. Accordingly, any more detailed information regarding services performed by the Plan's recordkeepers are of the type that "tend systematically to be in the sole possession of defendants" prior to discovery. *Braden*, 588 F.3d at 598. Therefore, the District Court erred in dismissing Plaintiffs' recordkeeping claim, and this Court should reverse the District Court's decision granting Defendants-Appellees' motion to dismiss and remand this case to the District Court for further proceedings on the merits.

## II. The First Amended Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor

The District Court did not address the merits of Plaintiffs' monitoring claim. The fiduciary duty to monitor is firmly entrenched under ERISA. An appointing

fiduciary is required to evaluate an appointee's performance at regular intervals to ensure that the plan is being properly managed in compliance with the plan terms and in accordance with ERISA. *Savage v. Sutherland Glob. Servs., Inc*., 521 F. Supp. 3d 308, 319 (W.D.N.Y. 2021); *see also Peterson, et al. v. Insurance Offices, Inc. et al.*, 2021 WL 1382168, at * 6 (D.N.J. April 13, 2021); *In re Schering-Plough ERISA Litig.*, 2010 WL 2667414, at *8 (D.N.J. June 29, 2010); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005). Plaintiffs have also adequately alleged specific facts concerning Defendants' monitoring process. *Savage*, 521 F.Supp at 319 ("The complaint contains allegations that Defendants (including Clearview) breached their duty to monitor by failing to ensure that, to the extent they delegated any of their fiduciary duties, they failed to properly monitor their appointees' consideration and investigation of investment options."). Plaintiffs' FAC contains similar factual allegations against the Monitoring Defendants that have been upheld in analogous cases. Because Plaintiffs have adequately alleged Defendants breached their fiduciary duties under ERISA, Plaintiffs need not allege any further facts for Defendants to be liable for co-fiduciary breaches under 29 U.S.C. § 1105(a).

## CONCLUSION

For the forgoing reasons, Plaintiffs-Appellants respectfully request the Court reverse the District Court's decision granting Defendants-Appellees' motion to

dismiss and remand this case to the district court for further proceedings on the merits.

Dated: November 3, 2023                          Respectfully submitted,

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: mark@capozziadler.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

1.     I certify that this brief complies with the provisions of Fed.R.App.P. 31(a)(4)(1), and that this brief contains 9.448 words, excluding the parts of the brief exempted by Fed.R.App.P. (32)(a)(7).

2.     I certify that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P 32(2)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 Word Times New Roman 14 point font.

3.  This document has been scanned for viruses and the brief is virus-free.

Dated: November 3, 2023                    */s/ Mark K. Gyandoh*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on November 3, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 3, 2023                    */s/ Mark K. Gyandoh*